**Eric KELLY, Plaintiff,**

v.

**Ms. AMBROSKI, et al., Defendants.**

**Case No. 2:13–cv–00504–MHH–JEO.**

United States District Court,
N.D. Alabama,
Southern Division.

Signed March 31, 2015.

Eric Kelly, Harvest, AL, pro se.

Philip G. Piggott, Starnes Davis Florie LLP, Birmingham, AL, for Defendants.

## *MEMORANDUM OPINION*

MADELINE HUGHES HAIKALA, District Judge.

In his report and recommendation, the Magistrate Judge recommended that the undersigned District Judge grant the defendants' motions for summary judgment. (Doc. 48). Mr. Kelly filed objections to the report and recommendation. (Doc. 49). For the reasons stated below, the Court adopts the Magistrate Judge's report and accepts his recommendation.

## STANDARD OF REVIEW

When reviewing a magistrate judge's report and recommendation, a district court must "make a de novo determination of those portions of the report or specified

proposed findings or recommendations to which objection has been made." 28 U.S.C. § 636(b)(1). When a party specifically objects to portions of the report and recommendation, the district judge must "give fresh consideration to those issues." *Jeffrey S. by Ernest S. v. State Bd. of Educ. of State of Ga.,* 896 F.2d 507, 512 (11th Cir.1990) (quoting H.R.Rep. No. 94–1609, *reprinted in* 1976 U.S.C.C.A.N. 6162, 6163). The district court reviews for clear error the portions of the report and recommendation to which no party has objected. *Macort v. Prem, Inc.,* 208 Fed.Appx. 781, 784 (11th Cir.2006). The district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

## ANALYSIS

### A. Referral to a Magistrate Judge

As a preliminary matter, Mr. Kelly argues that it was "unconstitutional and error for this court to refer his case to a magistrate [judge]." (Doc. 48 at 2). He complains that he did not knowingly waive his right to have his case heard before an Article III judge and did not consent to his case being assigned to a magistrate judge. (*Id.* at 1–13). Mr. Kelly misunderstands the referral process.

A district court has statutory authority to delegate prisoner petitions challenging conditions of confinement to a magistrate judge for initial consideration. *See* 28 U.S.C. § 636(b)(1)(B). The district court does not have to obtain the consent of the parties before referring these matters to a magistrate judge. 28 U.S.C. § 636(b)(1). Absent unanimous consent, a magistrate judge cannot issue a final judgment. Instead, the magistrate judge must issue a report and recommendation, and a district judge must review the review the report and recommendation, the evidence in the record, and the parties' objections to the report and recommendation before the district judge issues a final judgment.

That is what happened here. The District Court referred Mr. Kelly's case to Chief Magistrate Judge Ott. Chief Magistrate Judge Ott oversaw the initial procedural matters in the case. Then, because the parties did not unanimously consent to have him decide the case, Chief Magistrate Judge Ott issued a thorough, 42 page report and recommendation. In that report, the Magistrate Judge reviewed Mr. Kelly's allegations and the evidence in the record in the light most favorable to Mr. Kelly and evaluated the allegations and the evidence through the lens of binding Eleventh Circuit precedent. The undersigned, in turn, reviewed the entire record, including the report and recommendation and Mr. Kelly's objections, and the undersigned will issue a dispositive ruling.

Therefore, the Court OVERRULES Mr. Kelly's objection to the Court's referral of this case to a magistrate judge.

### B. The Merits of Mr. Kelly's Claims

In his objections, Mr. Kelly argues that Chief Magistrate Judge Ott "distorted and misstated" his claims concerning the seriousness of his medical condition. (Doc. 49 at 20). The Court disagrees. The Magistrate Judge viewed the facts in the light most favorable to Mr. Kelly. (Doc. 48 at 4). For example, in the "Summary Judgment Facts" portion of the report and recommendation, the Magistrate Judge stated:

> The plaintiff suffers extreme back pain and has trouble walking even with the aid of a cane. (Doc. 32 at 19). He is unable to stand or sit for any extended period of time because of his back pain. (*Id.*). The plaintiff has trouble standing in the shower to bathe, and suffers pain walking to and from the Health Care Unit, canteen, store, and kitchen. (*Id.*

at 20). The plaintiff no longer receives narcotic pain medication and the pain mediation he is now prescribed is of little or no help. (*Id.*). He is unable to sleep and suffers anxiety for fear of incurring irreparable nerve damage. (*Id.*). (Doc. 48 at 24). Mr. Kelly has not explained how the above description misrepresents his medical condition. Viewing the record in the light most favorable to Mr. Kelly, the Magistrate Judge's description of the seriousness of Mr. Kelly's medical condition is accurate.

■ The record demonstrates that Mr. Kelly's constant back pain constitutes a serious medical need, but the record does not indicate that the defendants have been deliberately indifferent to that need. Mr. Kelly's medical records reveal that prison medical staff routinely examined him for his complaints of back pain, prescribed pain medication, and referred him to outside specialists. (*See, e.g.,* Doc. 37–1, pp. 17, 22, 26–35). Although Mr. Kelly disagrees with Dr. Hood and Ms. Ambroski's determination that he is not an appropriate candidate for back surgery, a "difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis and course of treatment [does not] support a claim of cruel and unusual punishment." [1] *Harris v. Thigpen,* 941 F.2d 1495, 1505 (11th Cir.1991).

The Magistrate Judge properly stated the applicable legal standards in this case, and his finding that Mr. Kelly's evidence falls short is not in error. Mr. Kelly has not "place[d] verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment." *Hill v. Dekalb Reg'l Youth Detention Ctr.,* 40 F.3d 1176, 1186–87 (11th Cir.1994), *abrogated on other grounds by Hope v. Pelzer,* 536 U.S. 730, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002). In fact, Mr. Kelly's objective medical records suggest that the mild disc bulge for which he requests surgery has changed little over the years. For example, a report from an MRI that Mr. Kelly had in January 2014 states: "Well preserved lumbar spine structures. No new interval change detected as compared to the previous examination of March 2012. I have reviewed back even to an older examination of December 2009 and no new interval change is detected." (Doc. 37–1, p. 39). Dr. Hood and Ms. Ambroski have relied upon the opinions of physicians who have determined that Mr. Kelley's back pain is related to a stroke that he suffered years ago rather than the bulging disc in his back. (*See, e.g.* Doc. 31–1, p. 13). Therefore, the treatment that Mr. Kelly has received is not inadequate under the law.[2]

Mr. Kelly objects because the Magistrate Judge did not allow him to conduct discovery before the Magistrate Judge issued a report and recommendation on the defendants' motions for summary judgment. (Doc. 49 at 15). In the Order for

---

1. The plaintiff submitted the sworn affidavit of Inmate Donnie Lee with his objections. (Doc. 49, Ex. 1). Mr. Lee states that the plaintiff "is in a great deal of pain," which is undisputed. (Doc. 49, Ex. 1 at 1). The remainder of Mr. Lee's affidavit concerns the conditions of confinement at Limestone Correctional Facility and his belief that Warden Dewayne Estes and Assistant Warden Jimmy Patrick are not managing the facility well. Mr. Lee's affidavit does not address the nature and extent of the medical treatment that

Mr. Kelly has received, so it does not help Mr. Kelly create an issue of fact concerning his claims.

2. Mr. Kelly objects to the Magistrate Judge's finding that the statute of limitations bars any claim that the defendants denied him medical care prior to February 24, 2011. (Doc. 49 at 21–22). Because Mr. Kelly cannot prevail on the merits of his claims, the Court does not engage in a substantive analysis of the statute of limitations issue because the issue is moot.

Special Report, the Magistrate Judge directed the defendants to submit a written report accompanied by the sworn statements of all persons having knowledge of facts relevant to Mr. Kelly's claims or any subsequent investigation undertaken with respect to the claims. (Doc. 36 at 6). The Magistrate Judge also directed the defendants to submit a clear and legible copy of all documents relevant to the claims or defenses asserted in the action, including all incident reports, disciplinary reports, classification or custody records, and medical records, as may bear directly on the claims or defenses asserted. (*Id.* at 7). On April 2, 2014, defendants Corizon, Hood, and Ambroski filed a Special Report which included Dr. Hood's affidavit regarding Mr. Kelly's medical care and Mr. Kelly's relevant medical records. (Doc. 33). On June 9, 2014, defendants Corizon, Hood, and Ambroski supplemented their Special Report with additional medical records for Mr. Kelly. (Doc. 37–1).

In his opposition to the defendants' Special Report, Mr. Kelly seemed to argue that through discovery, he would have obtained medical records from Dr. Lampley, Dr. Crocker, Mr. Francavilla, Dr. Mosley, Dr. Grant, Dr. Pouparinas, and Dr. Falkman. (Doc. 47, pp. 10–14). Mr. Kelly contends that these physicians recommended surgery or injections for his back pain, and Dr. Hood denied or overruled these recommendations. Although the medical records from these physicians do not appear in the court record, crediting Mr. Kelly's allegations as true, the Magistrate Judge assumed that Mr. Kelly visited the doctors as described in the amended complaint. Based on Mr. Kelly's allegations, the Magistrate Judge recited in detail the recommendations that these physicians purportedly made regarding surgery or injections. (*See* Doc. 48, pp. 8–12). Assuming these medical records exist, as the Magistrate Judge did, discovery may have given Mr. Kelly an opportunity to review the documents before filing his opposition to the Special Report; however, the records would not have changed the Magistrate Judge's legal analysis of Mr. Kelly's claims because the Magistrate Judge gave Mr. Kelly the benefit of the doubt in his assessment of Mr. Kelly's medical and treatment history. Therefore, Mr. Kelly was not prejudiced by the lack of an opportunity to conduct discovery regarding these records.

## CONCLUSION

Having carefully reviewed and considered *de novo* all the materials in the Court file, including the report and recommendation and Mr. Kelly's objections, the Court adopts the Magistrate Judge's report and accepts his recommendation. The Court FINDS that there are no genuine issues of material fact and that the defendants are entitled to judgment as a matter of law. Accordingly, the Court will grant the defendants' motions for summary judgment and dismiss this action WITH PREJUDICE. A Final Judgment will be entered.

### *FINAL JUDGMENT*

In accordance with the Memorandum of Opinion entered contemporaneously herewith and with Rule 58, FED.R.CIV.P., it is hereby **ORDERED, ADJUDGED,** and **DECREED** that the defendants' motions for summary judgment are **GRANTED** and this action is **DISMISSED WITH PREJUDICE.**

Costs are taxed to the plaintiff.

For information regarding the cost of appeal, see the attached notice.

### *REPORT AND RECOMMENDATION*

JOHN E. OTT, United States Chief Magistrate Judge.

The plaintiff, Eric Kelly, initiated this action by filing a *pro se* amended com-

plaint pursuant to 42 U.S.C. § 1983, alleging that rights, privileges, or immunities afforded him under the Constitution or laws of the United States have been abridged during his incarceration at Limestone Correctional Facility in Harvest, Alabama. The plaintiff names as defendants Corizon, LLC, Dr. Hugh Hood, Registered Nurse Karen Ambroski, Warden Dewayne Estes, and Assistant Warden Jimmy Patrick.

In accordance with the usual practices of this court and 28 U.S.C. § 636(b)(1), the amended complaint was referred to the undersigned magistrate judge for a preliminary report and recommendation. *See McCarthy v. Bronson*, 500 U.S. 136, 111 S.Ct. 1737, 114 L.Ed.2d 194 (1991).

## I. Procedural History

On May 28, 2014, the court entered an Order for Special Report, directing that a copy of the amended complaint in this action be forwarded to the defendants and requesting that they file a Special Report addressing the factual allegations of the plaintiff's amended complaint. (Doc. 36). The court advised the defendants that the Special Report should be accompanied by sworn statements and, if appropriate, would be considered as a motion for summary judgment, filed pursuant to Rule 56 of the Federal Rules of Civil Procedure. (*Id.*). By the same order, the court advised the plaintiff that after he received a copy of the Special Report submitted by the defendants, he should file counter-affidavits if he wished to rebut the matters presented in the Special Report. (*Id.*).

On April 2, 2014, Defendants Corizon, Hood, and Ambroski filed a Special Report, accompanied by an affidavit and medical documents. (Doc. 33). On June 9, 2014, Defendants Corizon, Hood, and Ambroski supplemented their Special Report with additional medical documents. (Doc. 37). On July 8, 2014, Defendants Estes and Patrick filed a Special Report which included affidavits. (Doc. 41).

The magistrate judge notified the plaintiff that the defendants' Special Reports would be construed as motions for summary judgment and he would have twenty (20) days to respond by filing affidavits and other material if he chose. (Doc. 45). The magistrate judge also advised the plaintiff of the consequences of any default or failure to comply with Fed.R.Civ.P. 56. *Griffith v. Wainwright*, 772 F.2d 822, 825 (11th Cir.1985). The plaintiff filed several responses to the defendants' motions for summary judgment. (Docs. 35, 42, & 47).

## II. Summary Judgment Standard

In considering a motion for summary judgment, the court must determine whether the moving party is entitled to judgment as a matter of law. Summary judgment may be granted only if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. In making that assessment, the court must view the evidence in a light most favorable to the non-moving party and must draw all reasonable inferences against the moving party. *See Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir.2000). The burden of proof is upon the moving party to establish his *prima facie* entitlement to summary judgment by showing the absence of genuine issues and that he is due to prevail as a matter of law. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Unless the plaintiff, who carries the ultimate burden of proving his action, is able to show some evidence with respect to each element of his · claim, all other issues of fact become immaterial and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Bennett v. Parker*, 898 F.2d 1530, 1532–33 (11th Cir.1990).

■ As the Eleventh Circuit Court of Appeals has explained:

> Facts in dispute cease to be "material" facts when the plaintiff fails to establish a prime facie case. "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." Thus, under such circumstances, the public official is entitled to judgment as a matter of law, because the plaintiff has failed to carry the burden of proof. This rule facilitates the dismissal of factually unsupported claims prior to trial.

*Bennett v. Parker*, 898 F.2d at 1532 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). However, any "specific facts" pled in a *pro se* plaintiff's sworn complaint must be considered in opposition to summary judgment. *See Perry v. Thompson*, 786 F.2d 1093, 1095 (11th Cir.1986).

### III. Summary Judgment Facts

Based on the foregoing summary judgment standard, the following facts are undisputed or, if disputed, taken in a light most favorable to the plaintiff.

While housed at Bibb Correctional Facility in 2002, the plaintiff fell approximately five feet from his top bunk and injured his back. (Doc. 32 at 8; Doc. 33–1 at 27).[1] The plaintiff was later transferred to Limestone Correctional Facility. (Doc. 32 at 8).

On January 25, 2007, the plaintiff was seen by Salah Uddin, a general neurologist, at the Carraway Neurology Center. (Doc. 33–1, Hood Aff. at 3; Doc. 33–1 at 32). Dr. Uddin stated as follows:

> Mr. Kelly is a 41 year old right handed gentleman, who was being evaluated by Dr. Caudill Miler [sic], a neurologist at

Bibb Correctional Facilities. The patient was being evaluated with an MRI of the C-spine, T-spine, and lumbosacral spine without significant findings. Clinically reviewing the office notes of Dr. Miler [sic], the patient has some spastic findings in his lower extremities without any radiological findings of cord compression. He also had bilateral axillary masses reviewed with biopsy that showed for possible sarcoidosis because of granulomatous noncaseating lymphadenitis. His work-up including RPR was negative. The patient was complaining of pain in his right side of his back as well as knee and ankle joints with some myoclonic type of movement since 2002. This is somewhat worse towards the right than the left. He denied any bowel or bladder dysfunction or any injury to his back. He was also being evaluated with B12 as well as HIV test, which were all within normal limits. The patient denied any muscle twitching or muscle wasting over the last five years since 2002. He also denied having any trouble with speech or swallowing.

(*Id.*).

Dr. Uddin concluded that the plaintiff did not have enough features to be suggestive of motor neuron disease such as lateral sclerosis. (Doc. 33–1 at 34). However, Dr. Uddin stated that he would conduct an EMG and nerve conduction test on the plaintiff to rule out the diagnosis. (*Id.*). Dr. Uddin also noted that he would rule out radiculopathy. (*Id.*).

On April 9, 2007, Dr. Miller examined the plaintiff for his back pain. (Doc. 33–1 at 31). Dr. Miller noted that the plaintiff had no signs of Lou Gehrig's disease but that it could take several years to differentiate. (*Id.*). Dr. Miller questioned whether the plaintiff had sarcoid which should be

---

**1.** Citations are to CM/ECF page numbers.

evaluated by internal medicine. (*Id.*). Dr. Miller stated that the plaintiff did not have the classic features of neurosarcoidosis other than his hyper reflexia and spastic gait. (*Id.*). On the same day, Dr. Miller recommended to Dr. James Whitley at Bibb Correctional Facility that the plaintiff have a sarcoid evaluation, including chest x-ray, ACE level, and a lumbar puncture. (Doc. 33–1 at 30). Dr. Miller also prescribed the plaintiff Lyrica 75 mg for his pain. (*Id.*).

On October 9, 2007, Dr. Miller examined the plaintiff again. (Doc. 33–1, Hood Aff. at 4; Doc. 33–1 at 29). The plaintiff stated that he felt weaker and was having back pain. (Doc. 33–1 at 29). He also complained that Naprosyn made him nauseated. (*Id.*). Dr. Miller gave the following assessment and plan:

1. Atypical spastic myelopathy—The workup is complete, with MRI's of the cervical and thoracic spine being normal. I told him that he has an idiopathic myelopathy, and that I cannot say the cause of this. This is something we will have to follow. He clearly has a myelopathy, but being in prison with functional overlay, it just makes it very difficult. Until I can see something to "sink my teeth into," there is nothing further I can do. Whether this is neurosarcoidosis or just an idiopathic myelopathy, or an early sign of something like Lou Gehrig's disease, time will tell.

2. Mechanical back pain, chronic lumbar radiculopathy—He has been on multiple courses of anti-inflammatories, and could not tolerate Lyrica or Neurontin. I am going to try him on Celebrex, and set him up for some epidural steroids if they can be done through the prison system. I will see him in one year.

(*Id.*).

On March 7, 2008, an x-ray was taken of the plaintiff's lumbar spine. (Doc. 33–1, Hood Aff. at 4; Doc. 33–1 at 16). The plaintiff's alignment was found to be satisfactory with narrowing at the lumbosacral junction, which suggested degenerative disc disease at L5–S1. (*Id.*).

The plaintiff signed up for sick call due to severe back pain. (Doc. 32 at 8). Dr. Malcolm Hendrick, who was employed at Limestone, scheduled the plaintiff for an MRI. (*Id.*). On June 10, 2008, an MRI was taken of the plaintiff's lumbar spine. (Doc. 33–1, Hood Aff. at 4; Doc. 33–1 at 17). Dr. Joe Cannon noted that the plaintiff had a 5 year history of low back pain and right radicular symptoms. (*Id.*). Dr. Cannon also noted that the plaintiff fell from his bunk several years ago and had persistent complaints of back pain. (*Id.*). Dr. Cannon found the following:

The intervertebral disc spaces are quite well preserved at each level with the exception of a very slight general bulge at L4–5. Disk bulging smooth with no specific disk protrusion. No significant extradural defect or disc bulging otherwise. The neural foramina are well preserved on each side. No nerve root swelling. No focal edema or fracture. No evidence of renal swelling or obstruction with a normal caliber abdominal aorta. The psoas muscles are sharply defined and are quite well preserved. IMPRESSION: Slight smooth disk bulging at L4–5 with no herniation or stenosis. No evidence for recent or old compression fracture or endplate deformity. No other significant lumbar abnormality seen to suggest an etiology of the patient's pain.

(Doc. 33–1, Hood Aff. at 5; Doc. 33–1 at 17).

Dr. Lampley examined the plaintiff on June 30, 2008, concerning his complaints of back pain. (Doc. 32 at 8–9). Dr. Lampley

advised the plaintiff that his MRI showed he had a slipped disc which had entrapped the sciatic nerve which was causing the plaintiff's pain and recommended surgery. (*Id.*). Dr. Hugh Hood denied the plaintiff surgery. (*Id.*). Dr. Lampley left Limestone on July 22, 2008. (*Id.*).

On August 4, 2008, Dr. Crocker examined the plaintiff for his complaints of back pain. (Doc. 32 at 9). Dr. Crocker told the plaintiff that he had a bulging disc and he would send the plaintiff to a surgeon to see if something could be done. (*Id.*).

On September 11, 2008, the plaintiff was seen by John Denny, a certified physician assistant. (Doc. 33–1, Hood Aff. 5; Doc. 33–1 at 27). Mr. Denny summarized the plaintiff's history as follows:

> This is a new patient seen at the request of Limestone Correctional Facility for evaluation of some back and leg pain. He has had these pains since falling from the top bunk in 2002. Since that time, his pain has become progressively worse[ ]. He describes his pain as back and bilateral lower extremity pain right greater than left. He has some numbness on the plantar and dorsal surfaces of his right foot. He also complains of lower extremity weakness right greater than left. He has increased pain with movement and some difficulty walking necessitating the use of a cane. He denies any bowel dysfunction but does admit to urinary urgency and some mild incontinence. This is a chronic issue. He has had no treatments other than appropriate medications which have not significantly improved the situation.

(Doc. 33–1, Hood Aff. at 5; Doc. 33–1 at 27).

Mr. Denny's physical examination of the plaintiff revealed the following:

> Exam of range of motion of the lumbar spine is diminished and painful in all planes. He has good muscle bulk, strength and tone in the lower extremi-

ties. Reflexes at the patella and Achilles tendons are 2+ bilaterally. Appreciation of light touch and pinprick is diminished diffusely in his right lower extremity. Straight leg raising is negative bilaterally. There is no Tinel sign at the fibular head. He ambulates with a wide based unsteady gait.

(Doc. 33–1, Hood Aff. at 5; Doc. 33–1 at 27). The diagnostic studies read by Mr. Denny indicated that the plaintiff had an MRI on June 10, 2008, which showed a broad based bulge at L4–5. (*Id.*). Otherwise, the MRI of the plaintiff's lumbar spine was normal. (*Id.*). Mr. Denny gave the following recommendation:

> His symptoms seem to be out of proportion to his radiographic findings. One could consider a nerve test of the lower extremities. For final recommendations, please see Dr. Francavilla's note of the same date.

(Doc. 33–1, Hood Aff. at 6; Doc. 33–1 at 28). Dr. Francavilla recommended the plaintiff have an epidural shot instead of surgery. (Doc. 32 at 9). The plaintiff returned to Limestone the same day. (*Id.*).

The plaintiff was later seen by a new doctor at Limestone, Dr. Doshi. Dr. Doshi told the plaintiff that Dr. Hood denied Dr. Francavilla's recommendation that the plaintiff receive an epidural shot. (*Id.* at 9–10).

On February 5, 2009, the plaintiff was examined at Limestone by Dr. Mosley who recommended that the plaintiff obtain a second opinion from a surgeon in Huntsville. (Doc. 32 at 10). Dr. Crocker denied Dr. Mosley's recommendation. (*Id.*).

On February 24, 2009, Mr. Hooper, a nurse practitioner, examined the plaintiff. (*Id.*). Mr. Hooper stated that the plaintiff had pressure on the sciatic nerve which was causing him pain. (*Id.*). Mr. Hooper told the plaintiff he would refer him to Dr.

Crocker and recommend that the plaintiff see a surgeon in Hunstville. (*Id.*). As of March 10, 2009, the plaintiff had not seen anyone about his pain. (*Id.*).

On April 14, 2009, the plaintiff met with Dr. Manuel Pouparinas, a new doctor at Limestone. (Doc. 32 at 10). Dr. Pouparinas prescribed the plaintiff pain medication and recommended a nerve and biopsy test. (*Id.* at 10–11). Dr. Pouparinas's recommendation for a nerve and biopsy test was denied but the plaintiff was approved for the epidural shot that had been denied previously. (*Id.* at 11).

On June 9, 2009, the plaintiff was transported to a hospital in Huntsville for an epidural shot. (*Id.*). Dr. Roddie Grant administered the shot to the plaintiff but told him the shot may not be effective if the plaintiff had not already undergone surgery. (*Id.*). Dr. Grant also informed the plaintiff that the shot would not solve the plaintiff's back problem and the plaintiff would need surgery. (*Id.*).

The epidural shot did not help the plaintiff's back pain and Dr. Pouparinas ordered another MRI for the plaintiff. (Doc. 32 at 11). On December 28, 2009, the plaintiff had a follow-up MRI of his lumbar spine. (Doc. 33–1, Hood Aff. at 6; Doc. 33–1 at 18). The plaintiff's pain had increased since his last MRI on June 10, 2008. (*Id.*). Dr. Cannon concluded that the plaintiff had slight general bulging at L4–5 slightly greater to the right, but that it was stable and unchanged since June 2008. (Doc. 33–1, Hood Aff. at 7; Doc. 33–1 at 18). Dr. Cannon also noted a slight right-sided L4–5 facet joint degenerative change, perhaps slightly worse than on the previous examination. (*Id.*).

Dr. Pouparinas continued to prescribe the plaintiff pain medication and requested that the plaintiff be approved for an off-site pain clinic. (Doc. 32 at 12). Dr. Hood denied Dr. Pouparinas's requests. (*Id.*).

After Dr. Pouparinas left Limestone, the plaintiff was seen by Dr. Falkman. (*Id.*). Dr. Falkman recommended that the plaintiff see a surgeon but her request was denied. (*Id.*). Dr. Falkman left Limestone less than a month after the plaintiff's appointment with her. (*Id.*).

The plaintiff was seen by Dr. Barrett who ordered another MRI and concluded that the plaintiff should see a surgeon. (*Id.* at 12). On March 1, 2011, an MRI was conducted of the plaintiff's cervical, thoracic, and lumbar spine. (Doc. 33–1, Hood Aff. at 7; Doc. 33–1 at 19). Dr. Cannon noted the following:

> L4–5: Very minimal smooth bulge or loss of the normal convexity of the disc but no protrusion or extrusion. Minimal asymmetric thickening of the left ligamentum flavum is compared to the right but still quite well-preserved. Extent of degenerative facet joint change is minimal and unchanged as compared to the previous examination of 2009.

(*Id.*). Dr. Cannon further stated, "Minimal loss of the normal convexity of the disc at L4–5 consistent with slight degenerative change only. No new or significant interval change as compared to 2009." (Doc. 33–1, Hood Aff. at 8; Doc. 33–1 at 19). The plaintiff also underwent a cervical MRI the same day, which was read as normal. (Doc. 33–1, Hood Aff. at 8; Doc. 33–1 at 20).

When Dr. Barrett saw the plaintiff after the MRI, he stated that he had spoken with Dr. Hood and agreed with him that there was no need for the plaintiff to see a surgeon. (Doc. 32 at 12–13). Dr. Barrett prescribed the plaintiff a different pain medication. (*Id.* at 13). On July 24, 2012, Dr. Hood discontinued the plaintiff's pain medication. (*Id.*).

On February 9, 2012, a follow-up x-ray was taken of the plaintiff's lumbar spine.

(Doc. 33–1, Hood Aff. at 8; Doc. 33–1 at 21). Dr. Liu stated the following:

> Results: There is anatomic alignment of lumbar vertebrae. The vertebral bodies have normal shape and ossification pattern. Posterior elements are intact.
>
> Conclusion: Normal lumbar spine series.

(*Id.*).

On June 17, 2012, the plaintiff filed a medical grievance requesting to be sent to an orthopedic surgeon since pain management was of no help. (Doc. 1 at 15; Doc. 32 at 13). The plaintiff also stated that the previous month, three inmates had back surgery and two more were scheduled for surgery. (Doc. 1 at 15). The plaintiff argued that his condition was no different than theirs. (*Id.*).

On June 19, 2012, Health Services Administrator Karen Ambroski responded that the plaintiff's condition was different than other inmates and that medical staff was not keeping the plaintiff from getting treatment. (Doc. 1 at 15). Defendant Ambroski further stated that the plaintiff's "symptoms do not match the documented problem at the present time" and that he was not a surgical candidate. (*Id.*).

On June 21, 2012, the plaintiff submitted a grievance appeal. (Doc. 1 at 16). The plaintiff requested that he be referred to a neurosurgeon for a second opinion. (*Id.*). Defendant Ambroski responded that the plaintiff could ask the doctor to send him for a second opinion since the doctor was familiar with the plaintiff's care. (*Id.*). Ambroski instructed the plaintiff to "put in a sick call and state your case." (*Id.*).

Later the same week, or a week later, the plaintiff was seen by Dr. Pavlakovic at Limestone. (Doc. 32 at 13). The plaintiff requested an off-site appointment with an orthopedic surgeon in Huntsville for a second opinion. (*Id.*). Dr. Pavlakovic agreed to refer the plaintiff to a surgeon. (*Id.* at 13–14). An appointment was made for the plaintiff to see Dr. Curt L. Freudenberger at the SportsMed Orthopedic Surgery and Spine Center. (Doc. 33–1, Hood Aff. at 8).

On July 11, 2012, Dr. Freudenberger examined the plaintiff. (Doc. 33–1, Hood Aff. at 8; Doc. 33–1 at 25). Dr. Freudenberger's history of the plaintiff's complaints is as follows:

> Mr. Kelley [has] ... a multi-year history of low back pain radiating principally to the right lower extremity. He has been evaluated by separate physicians. He arrives today seeking an additional opinion, as well as definitive treatment. The pain will radiate from the immediate low back area to the right lower extremity along the gluteal, posterolateral thigh, and calf. Symptoms are exacerbated by prolonged standing and ambulating and are decreased somewhat by being supine or using a cane for ambulation. He ranks it overall as a 7/10 and quantifies it as 20% back and 80% leg.

(*Id.*). Dr. Freudenberger further stated in pertinent part:

> BILATERAL LOWER EXTREMITIES: He has a positive right straight leg raise test consistent with the L5 nerve root distribution. Decreased subjective sensation in the first and second toe. Knee extension and hip flexion are 4/5. EHL and doriflexion are at 4/5. He leans towards the left when ambulating. He is unable to toe and heel walk due to the degree of radiating pain. When watching him ambulate in the clinic setting, his gait overall appears unsteady. I do not know if this is simply due to the pain radiating to the right leg or something more neurological in nature. Right L4 deep tendon reflex is at 0–1/4, otherwise 2/4 throughout.
>
> IMAGING: Radiographic evaluation shows mild decreased joint space height at L5–S1.

MRI report describes no profound central or foraminal stenosis.

ASSESSMENT AND PLAN: At this point, I would like to obtain a new MRI of the lumbar spine. He will be scheduled for a right L4–5 microdiscectomy. However, I would like to: 1) Review this MRI. 2) I would like to discuss his care with the neurologist that he saw in the Birmingham area. If the MRI does not show any profound foraminal or central stenosis, I may ask for a separate opinion on evaluation of his lower extremities. I am concerned that there may be a baseline neurological disorder. This is based simply on the discordant nature of his gait.

(Doc. 33–1, Hood Aff. at 8–9; Doc. 33–1 at 26).

On July 24, 2012, Dr. Pavlakovic examined the plaintiff at Limestone. (Doc. 32 at 14). On July 25, 2012, the plaintiff filed a grievance because he had not received his pain medication and ibuprofen was not effective. (*Id.*). Defendant Ambroski responded that Dr. Pavlakovic ordered the plaintiff pain medication on July 24, 2012, but Dr. Hood denied the order. (*Id.*). Ambroski also stated that the plaintiff's MRI in 2011 did not show any damage and that medical staff was trying determine the source of the plaintiff's condition but he would not be approved for opiate pain medication for chronic pain. (*Id.* at 14–15).

On July 26, 2012, the plaintiff submitted a grievance in which he complained that his pain medication had been discontinued. (Doc. 1 at 17). The plaintiff further complained that ibuprofen was of no help for his back pain. (*Id.*). The plaintiff requested that he be prescribed Norco. (*Id.*).

On July 30, 2012, Defendant Ambroski responded that Dr. Pavlakovic ordered the plaintiff pain medication but Dr. Hood denied it. (*Id.*). Ambroski also noted that

the plaintiff was scheduled for an MRI and that his MRI from 2011 did not show any damage. (*Id.*). She again told the plaintiff that he could not receive opiate pain medication for chronic pain. (*Id.*).

On August 2, 2012, the plaintiff filed a grievance appeal in which he stated Dr. Freudenberger confirmed he had a sciatic nerve problem. (Doc. 1 at 18; Doc. 32 at 15). The plaintiff stated Dr. Freudenberger recommended he have another MRI before the surgery to ensure he did not have to do more than repair a pinched nerve. (*Id.*). The plaintiff reasoned that there was no need for medical staff to continue to researching what was wrong with him. (*Id.*). The plaintiff also requested again to be prescribed Norco until his surgery. (*Id.*). The plaintiff stated that other inmates were still receiving Norco. (*Id.*).

On August 6, 2012, Defendant Ambroski responded that Dr. Pavlakovic recommended that the plaintiff have medication until surgery but Dr. Hood denied the specific medication because the plaintiff had chronic pain. (*Id.*).

On August 3, 2012, the plaintiff underwent a MRI for his lumbar spine and brain. (Doc. 33–1, Hood Aff. at 9). Dr. Cannon found that L4–5 was well preserved with "only the slightest degree of smooth loss of the normal convexity of the disc but no appreciable bulge or protrusion." (Doc. 33–1, Hood Aff. at 9; Doc. 33–1 at 22). Dr. Cannon concluded that there was no significant lumbar abnormality. (*Id.*). Concerning the MRI of the plaintiff's brain, Dr. Cannon made the following findings:

Intact skull base with normal cervical occipital junction. Normal-sized ventricles. There is a small area of bright signal in the region along the posterior lenticular nuclei of the left hemisphere. This is at the junction of the posterior

lenticular nucleus and anterior thalamus. This measures only about 8 mm across and is not surrounded by an edema. There is no enhancement in this region. It is consistent with a previous small lacunar infarction, possibly related to microangiopathy. Normal brainstem and posterior fossa structures including normal CP angles. Smooth temporomandibular joints bilaterally. No areas of abnormal enhancement. Normal sella pituitary region. Intact clivus and skull base. No extra axial hematoma or evidence for a fracture. The paranasal sinuses and mastoid appear quite clearly aerated.

(Doc. 33–1 at 22). Dr. Cannon found no evidence of focal cerebritis or recent infarction or brain tumor but did note mild scattered changes consistent with microangiopathy, the largest being in the left hemisphere. (*Id.*).

On August 15, 2012, the plaintiff filed a medical grievance because he had not been scheduled for surgery. (Doc. 1 at 19; Doc. 32 at 15). The plaintiff also stated that medical staff was harassing and discriminating against him. (*Id.*).

On August 17, 2012, Defendant Ambroski responded that medical staff was not harassing or discriminating against the plaintiff. (Doc. 1 at 19). Ambroski stated that medical staff could not proceed with the plaintiff's treatment until they received a written medical report from Dr. Freudenberger, which had been requested. (*Id.*).

On August 21, 2012, the plaintiff submitted a grievance appeal in which he maintained that Ambroski saw Dr. Freudenberger's report on July 24, 2012, when Dr. Pavlakovic showed it to her. (Doc. 1 at 20). Defendant Ambroski responded, "If it states you are a candidate for surgery you will get it. If your [sic] not we will treat you as MD states we should." (*Id.*).

The plaintiff wrote Warden Dewayne Estes three times for help concerning his medical treatment, but Estes failed to respond. (Doc. 32 at 16, 19). The plaintiff also spoke to Captain Smith several times. (*Id.* at 16). When Captain Smith and the plaintiff spoke to Defendant Ambroski about his medical condition, she denied that there was any recommendation for the plaintiff to receive back surgery and that she was still waiting to hear from the orthopedic surgeon. (*Id.*).

On August 24, 2012, the plaintiff submitted a medical grievance, accusing medical staff of delaying his surgery. (Doc. 1 at 21). He also stated that his "people" called Dr. Freudenberger and he stated there were no changes to his report and he did not know why the prison's medical staff was delaying the surgery. (*Id.*).

On August 27, 2012, Defendant Ambroski responded that the plaintiff saw Nurse Means on August 24, 2012, and he was informed that he was being referred to a neurosurgeon. (Doc. 1 at 21). Ambroski stated that she had just received his MRI. (*Id.*). Defendant Ambroski further told the plaintiff that she doubted Dr. Freudenberger discussed his medical condition with anyone over the telephone because it was a HIPPA violation. (*Id.*).

On August 24, 2012, the plaintiff also filed a grievance appeal, requesting a meeting with medical staff and Warden Estes concerning the delay in receiving surgery. (Doc. 1 at 22). On August 27, 2012, Defendant Ambroski responded that the plaintiff was being referred to a specialist. (*Id.*). She stated that if the plaintiff signed a refusal, he would not go. (*Id.*). Defendant Ambroski also told the plaintiff that Dr. Freudenberger had not sent her the report concerning his condition. (*Id.*).

On August 28, 2012, the plaintiff filed a medical grievance stating that Dr. Freu-

denberger's report was in the plaintiff's medical jacket. (Doc. 1 at 23). On August 30, 2012, Defendant Ambroski stated that the report was not in the plaintiff's medical jacket and she had requested a copy of it. (*Id.*).

On August 29, 2012, the plaintiff filed a medical grievance in which he stated that he would not refuse to see a specialist. (Doc. 1 at 24). The plaintiff again requested a meeting with the Warden and medical staff. (*Id.*).

On August 30, 2012, Defendant Ambroski stated there would not be a meeting and the plaintiff could write the Warden because she had no answers that the plaintiff would want to hear. (*Id.*). She further stated that she had the plaintiff's MRI and had requested a copy of the report Dr. Freudenberger dictated on July 11, 2012, after he examined the plaintiff. (*Id.*).

On September 11, 2012, Defendant Ambroski and Dr. Stubbs, a new doctor at Limestone, requested that the plaintiff be seen by an orthopedic surgeon. (Doc. 32 at 16). Dr. Hood denied the request. (*Id.*). Instead, the plaintiff was scheduled to see Dr. Mulpur, a neurologist. (*Id.*). Defendant Ambroski stated that if the neurologist found that the plaintiff had not suffered a stroke, then she would send him to an orthopedic surgeon. (*Id.*).

On September 18, 2012, the plaintiff filed a medical grievance in which he complained that he had not been referred to a specialist. (Doc. 1 at 25). On September 19, 2012, Defendant Ambroski responded that the plaintiff had a confirmed appointment. (*Id.*).

Dr. Mulpur examined the plaintiff on September 27, 2012, and informed him that he had not suffered a stroke, but had a pinched nerve. (Doc. 33–1, Hood Aff. at 10; Doc. 32 at 16). Dr. Stubbs reviewed the plaintiff's history on October 4, 2012,

and spoke with the plaintiff about the results. (Doc. 33–1, Hood Aff. at 10).

On October 29, 2012, the plaintiff was sent for an MRI of both the cervical and thoracic spine. (Doc. 33–1 at 23). Dr. Cannon found the plaintiff had well preserved cervical structures with no impressive change detected as compared to his March 2011 exam. (*Id.*). Dr. Cannon also found the plaintiff to have a normal thoracic spine. (*Id.*).

On October 29, 2012, the plaintiff filed a medical grievance in which he stated that he was taken for an MRI and requested to know when he would see a surgeon. (Doc. 1 at 26). On October 31, 2012, Nurse Ambroski responded that the plaintiff was scheduled to see the doctor that week. (*Id.*).

On November 2, 2012, the plaintiff filed medical grievances complaining that he had not been referred to a surgeon. (Doc. 1 at 27, 28; Doc. 32 at 17). On November 5, 2012, Ambroski responded for the plaintiff to come see her in person. (*Id.*).

On November 7, 2012, Dr. Freudenberger made an addendum to his earlier assessment of the plaintiff's condition on July 7, 2012. (Doc. 33–1, Hood Aff. at 11; Doc. 33–1 at 26). Dr. Freudenberger stated the following:

> In review of multiple MRIs, including cervical, thoracic, and lumbar spine, I do not appreciate any signs of severe central stenosis. There are some concerns raised by a neurologist that there is evidence of long tract signs. I certainly do not see this ratified on any studies. What I do see is that at L4–5 there is a slight right paracentral disc bulge at the neural foraminal level. It is not severe in nature. There could be a component of L4 versus L5 nerve root, but once again it is not of great concern. I think a larger concern is his prior cerebrovascular accident. It certainly could con-

tribute to the weakness on the right upper and lower extremity if he had a left sided CVA. At this point, we have ruled out for any concerns of long tract signs. There can always be a consideration of an epidural injection as a diagnostic study at the L4–5 level. However, given the relatively small size of the disc bulge when compared to the severity of symptoms, the symptoms are likely attributed to the prior CVA. I appreciate the consultation. At this point, I would like to proceed with conservative management. Should you consider an epidural injection at right L4–5, I would be happy to see the patient afterwards, however, at this point, I believe signing off from this case is appropriate.

(*Id.*).

On November 8, 2012, the plaintiff went to see Defendant Ambroski. (Doc. 32 at 17). Ambroski, Dr. Stubbs, and Captain Smith were present. (Doc. 32 at 17; Doc. 33–1, Hood Aff. at 11). Dr. Stubbs told the plaintiff that he would not be seen by an orthopedic surgeon. (Doc. 32 at 17). The plaintiff was offered steroid injections at L4–5, but the plaintiff did not agree with the course of treatment being offered and left the office. (Doc. 33–1, Hood Aff. at 11).

The plaintiff next saw Dr. Stubbs for a follow-up appointment for his pain medication. (*Id.*). The plaintiff stated that he wanted the medications Norco or Ultram. (*Id.*). Dr. Stubbs offered the plaintiff Indocin. (*Id.*). The plaintiff indicated that he preferred Motrin. (Doc. 33–1, Hood Aff. at 11–12). The plaintiff was prescribed Motrin. (*Id.* at 12). On January 31, 2013, Dr. Stubbs saw the plaintiff for profile renewals. (*Id.*).

In February 2013, the plaintiff presented to the Health Care Unit because of back pain. (Doc. 32 at 17). Dr. Stubbs examined the plaintiff and recommended that he receive another epidural shot. (*Id.*

at 17–18). Two weeks later, Dr. Stubbs informed the plaintiff that Dr. Hood denied the epidural shot. (*Id.* at 18).

On May 15, 2013, Dr. Stubbs again examined the plaintiff due to severe back pain. (*Id.*). Dr. Stubbs sent a request to Defendant Ambroski that the plaintiff be referred to an orthopedic surgeon. (*Id.*). On June 21, 2013, Dr. Stubbs told the plaintiff that Dr. Hood denied his recommendation that the plaintiff be referred to an orthopedic surgeon. (Doc. 32 at 18).

The plaintiff wrote Assistant Warden Jimmy Patrick and requested assistance in getting appropriate medical care for his back. (*Id.*). Patrick did not respond to the plaintiff's letter so the plaintiff sent Patrick a second letter on August 28, 2013. (*Id.*). The plaintiff spoke with Defendant Patrick in person and Patrick stated that he would speak to Defendant Ambroski. (Doc. 32 at 18–19). The plaintiff did not hear from Defendant Ambroski and was not given additional treatment. (*Id.* at 19). Later, Defendant Patrick asked the plaintiff if the medical staff provided him with treatment for his back. (*Id.*). The plaintiff responded that they had not. (*Id.*). Defendant Patrick stated that he would talk to Defendant Ambroski and medical personnel again. (*Id.*). The plaintiff did not receive additional treatment for his back. (*Id.*).

The plaintiff suffers extreme back pain and has trouble walking even with the aid of a cane. (Doc. 32 at 19). He is unable to stand or sit for any extended period of time because of his back pain. (*Id.*). The plaintiff has trouble standing in the shower to bathe, and suffers pain walking to and from the Health Care Unit, canteen, store, and kitchen. (*Id.* at 20). The plaintiff no longer receives narcotic pain medication and the pain medication he is now prescribed is of little or no help. (*Id.*). He is unable to sleep and suffers anxiety for fear

of incurring irreparable nerve damage. (*Id.*).

On December 23, 2013, the plaintiff signed up for sick call, complaining that his back pain was getting worse and the pain medications were not helping. (Doc. 32 at 20).

On December 30, 2013, Defendant Hood examined the plaintiff. (Doc. 32 at 20–21). The plaintiff told Hood that his back pain had worsened and his mobility had decreased. (*Id.* at 21). The plaintiff also informed Defendant Hood that another doctor recommended that he have surgery on July 11, 2012. (*Id.*). Dr. Hood denied knowing that back surgery had been recommended for the plaintiff. (*Id.*). Both Dr. Hood and Dr. Rigaux, the new prison doctor, told the plaintiff that they did not think his condition was serious enough for surgery and that Dr. Freudenberger had only recommended surgery for money. (*Id.*). Dr. Hood stated that he would not have a problem sending the plaintiff back to Dr. Freudenberger if the plaintiff submitted to another MRI first. (*Id.*).

On January 9, 2014, plaintiff underwent an MRI of the lumbar spine with and without contrast. (Doc. 33–1 at 24). Dr. Cannon concluded that the plaintiff's lumbar spine structures were well preserved and there was no new interval change detected as compared to the previous examination of March 2012. (Doc. 33–1 at 24). Dr. Cannon further noted that he had reviewed the plaintiff's December 2009 MRI and detected no new interval change. (*Id.*).

On January 14, 2014, Defendant Ambroski and Dr. Rigaux informed the plaintiff that he would not be referred to an orthopedic surgeon. (Doc. 32 at 22).

A brain MRI taken of the plaintiff revealed the plaintiff suffered in the past from a left hemispheric stroke that has caused and contributed to his muscle weakness and spasm, hyper reflexia and resulting back pain. (Doc. 33–1, Hood Aff. at 13). Defendant Hood states that this has been explained to the plaintiff. (*Id.*). Hood maintains that, although the plaintiff has back pain, it is caused by the prior stroke and, therefore, he is not a surgical candidate. (*Id.*).

The plaintiff is a black male and alleges that during the events made the basis of this action, the defendants have approved surgery for at least six white male prisoners—Barry Kidd, Wayne Hurst, Louis Odo, Bobby Smith, Thomas Trickey, and Kevin Roper. (Doc. 32 at 22). The plaintiff claims that these individuals' back conditions were as severe or less severe than the plaintiff's back condition. (*Id.* at 22–23).

Defendants Estes and Patrick have no medical training. (Doc. 41–1, Estes Aff. at 3; Doc. 41–2, Patrick Aff. at 3). At all relevant times, Defendants Estes and Patrick deferred to employees of Corizon with regard to treatment and medical care provided to inmates at Limestone, including the plaintiff. (*Id.*).

## IV. Discussion

### A. Official Capacity Claims

To the extent the plaintiff's constitutional claims are brought against the individual defendants in their official capacities for monetary relief, the plaintiff's claims are due to be dismissed under the doctrine of sovereign immunity. It is well established that the Eleventh Amendment to the United States Constitution bars 42 U.S.C. § 1983 claims against the state or an agency of the state. *See Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). Likewise, lawsuits against a state official in his or her official capacity are suits against the state when "the state is the real, substantial party in interest." *Id.* at 101, 104 S.Ct. 900. Although Eleventh Amendment immunity protects state offi-

cials from suits for money damages, actions against a state official for prospective injunctive relief are outside the protection offered by the Eleventh Amendment. *Id.* at 102–03, 104 S.Ct. 900; *see Carr v. City of Florence,* 916 F.2d 1521, 1524 n. 2 (11th Cir.1990).

Based on the foregoing, the defendants' motions for summary judgment on the plaintiff's claims against them, in their official capacities for monetary relief, are due to be granted and the claims are due to be dismissed.

## B. Eighth Amendment Medical Claims

The plaintiff alleges that the defendants have been deliberately indifferent to his serious medical needs during his incarceration at Limestone Correctional Facility. The United States Supreme Court has held that it is only deliberate indifference to serious medical needs which is actionable under 42 U.S.C. § 1983. *See Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Indeed, the conduct of prison officials must run counter to evolving standards of decency or involve the unnecessary and wanton infliction of pain to be actionable under § 1983. *See Bass v. Sullivan,* 550 F.2d 229 (5th Cir.1977). Mere negligence is insufficient to support a constitutional claim. *See Fielder v. Bosshard,* 590 F.2d 105 (5th Cir.1979). Moreover, an accidental or inadvertent failure to provide medical care, or negligent diagnosis or treatment of a medical condition, does not constitute a wrong under the Eighth Amendment. *See Ramos v. Lamm,* 639 F.2d 559 (10th Cir.1980). Additionally, "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle v. Gamble,* 429 U.S. at 106, 97 S.Ct. 285. Neither will a mere difference of opinion between an inmate and the institution's medical staff as to treatment and diagno-

sis alone give rise to a cause of action under the Eighth Amendment. *See Smart v. Villar,* 547 F.2d 112 (10th Cir. 1976); *see also Estelle v. Gamble,* 429 U.S. 97, 106–08, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).

Deliberate indifference can be shown in a variety of ways. As the Eleventh Circuit Court of Appeals noted:

Our cases have consistently held that knowledge of the need for medical care and an intentional refusal to provide that care constitutes deliberate indifference. Medical treatment that is "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness" constitutes deliberate indifference. Additionally, when the need for medical treatment is obvious, medical care that is so cursory as to amount to no treatment at all may constitute deliberate indifference.

*Adams v. Poag,* 61 F.3d 1537, 1543 (11th Cir.1995) (internal citations omitted).

An official also acts with deliberate indifference when he intentionally delays providing an inmate with access to medical treatment, knowing that the inmate has a life-threatening or urgent medical condition that would be exacerbated by delay. *See Hill v. Dekalb Reg'l Youth Detention Ctr.,* 40 F.3d 1176, 1186–87 (11th Cir.1994), *abrogated on other grounds by Hope v. Pelzer,* 536 U.S. 730, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002); *see also Harris v. Coweta County,* 21 F.3d 388, 394 (11th Cir.1994). Delay in access to medical treatment can violate the Eighth Amendment when it is "tantamount to 'unnecessary and wanton infliction of pain.'" *Brown v. Hughes,* 894 F.2d 1533, 1537 (11th Cir.1990) (internal citations omitted).

"In contrast, delay or even denial of medical treatment for superficial, non-serious physical conditions does not

constitute an Eighth Amendment violation." *Hill v. Dekalb Reg'l Youth Detention Ctr.*, 40 F.3d 1176, 1186–87 (11th Cir. 1994), *abrogated on other grounds by Hope v. Pelzer*, 536 U.S. 730, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002). A medical need is considered serious when delay results in an inmate suffering "a lifelong handicap or permanent loss." *Monmouth County Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3rd Cir.1987). An inmate claiming an unconstitutional delay in medical treatment "must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment to succeed." *Hill*, 40 F.3d at 1188, *abrogated on other grounds by Hope v. Pelzer*, 536 U.S. 730, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002).

### 1. Statute of Limitations

To the extent the plaintiff alleges in his complaint that the defendants denied him medical care prior to February 24, 2011, such claims are barred by the statute of limitations. The United States Supreme Court has held that the proper statute of limitations for a 42 U.S.C. § 1983 action is the forum state's general or residual statute of limitations for personal injury. *See Owens v. Okure*, 488 U.S. 235, 236, 249–50, 109 S.Ct. 573, 102 L.Ed.2d 594 (1989). The residual statute of limitations for personal injury in Alabama is two (2) years.[2] Ala.Code § 6–2–38(*l*) (1975).

The Eleventh Circuit Court of Appeals has stated that " 'the statute [of

---

**2.** Alabama Code § 6–2–38(*l*) (1975) provides: "All actions for any injury to the person or rights of another not arising from contract and not specifically enumerated in this section must be brought within two years."

**3.** Because a prisoner proceeding *pro se* has virtually no control over the mailing of his pleading, it is deemed to be filed at the time the prisoner delivers the pleading to prison or

limitations] does not begin to run until the facts which would support a cause of action are apparent or should be apparent to a person with a reasonably prudent regard for his rights.' " *Calhoun v. Alabama Alcoholic Beverage Control Board*, 705 F.2d 422, 425 (11th Cir.1983) (quoting *Reeb v. Econ. Opportunity Atlanta, Inc.*, 516 F.2d 924, 930 (5th Cir.1975)). Therefore, a § 1983 action does not accrue until the plaintiff knows or has reason to know that he or she has been injured. *See Calhoun*, 705 F.2d at 424. Moreover, a § 1983 action will not accrue until the plaintiff is aware or should have been aware who has inflicted the injury. *See Mullinax v. McElhenney*, 817 F.2d 711, 716 (11th Cir. 1987).

The plaintiff complains that he has been denied medical care for his back pain since June 2008. Moreover, the plaintiff knew the individuals responsible for denying him medical care. Because the plaintiff did not file the present action until February 24, 2013, the only claims that are properly within the statute of limitations are those that occurred on or after February 24, 2011.[3] (Doc. 1 at 10). Based on the foregoing, the defendants' motions for summary judgment on the plaintiff's constitutional claims which occurred prior to February 24, 2011, are due to be granted and the claims are due to be dismissed.

### 2. Corizon, LLC

To the extent the plaintiff seeks to state a claim against Corizon,

---

jail officials to be mailed. *See Houston v. Lack*, 487 U.S. 266, 270–72, 108 S.Ct. 2379, 101 L.Ed.2d 245 (1988). Although the record contains no information regarding the date the plaintiff gave his original complaint to prison officials to mail, he signed his complaint on February 24, 2013. (Doc. 1 at 10). The court will therefore deem the plaintiff's original complaint to have been filed on February 24, 2013.

LLC, based on the conduct of its employees, such claim is due to be dismissed. The plaintiff cannot state a claim for relief against a corporation based on the actions of its employees. Specifically, while a corporation providing prison medical services may be liable under § 1983 if it is established that the constitutional violation was the result of the corporation's policy or custom, such a corporation may not be held liable under § 1983 on the basis of respondeat superior. *See Buckner v. Toro,* 116 F.3d 450 (11th Cir.1997); *Monell v. Dept. of Soc. Serv.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Instead, a plaintiff must allege that the corporation has a policy, practice, or custom that represents official policy that resulted in the alleged discouragement, delay or denial of medical treatment to inmates so as to deny plaintiff his constitutional rights. *See Berdin v. Duggan,* 701 F.2d 909, 914 (11th Cir.1983). Additionally, a plaintiff must plead more than a blanket assertion that a policy or practice existed; he must specifically identify which policy or practice, if any, caused his injuries. *See Wayne v. Jarvis,* 197 F.3d 1098, 1105 (11th Cir.1999). Furthermore, the Eleventh Circuit has stated that "[t]o establish a policy or custom, it is generally necessary to show a persistent and wide-spread practice." *Id.* The Eleventh Circuit has defined "custom" to mean "a practice that is so settled and permanent that it takes on the force of law." *Wayne,* 197 F.3d at 1105.

The plaintiff fails to allege in his complaint that Corizon maintained a policy or custom which contributed in any way to the claimed constitutional violations. Therefore, Corizon's motion for summary judgment on the plaintiff's Eighth Amendment medical claims is due to be granted and the claims are due to be dismissed.

### 3. Defendants Hood & Ambroski

The plaintiff alleges that Defendants Hood and Ambroski failed to provide him with adequate medical treatment for his back pain. Specifically, the plaintiff claims he was denied back surgery and certain narcotic medications to manage his back pain.

Viewing the facts in a light most favorable to the plaintiff, his back pain constituted a serious medical need. However, there is no evidence that Defendants Hood and Ambroski were deliberately indifferent to that need. The medical evidence shows that medical staff regularly examined the plaintiff for his complaints of back pain, prescribed him pain medication, scheduled multiple diagnostic procedures for him, and sent him to several specialists outside of the prison. The plaintiff is merely upset that Hood and Ambroski have concluded he is not an appropriate candidate for back surgery. Additionally, the medical records show that medical staff have offered the plaintiff alternative pain medications such as Indocin but he insists on being prescribed narcotic pain medication such as Norco and Ultram, which medical staff will not prescribe due to the plaintiff's chronic condition. The fact that the plaintiff disagrees with the efficacy of the treatment recommended or simply prefers a different course of treatment does not state a constitutional claim. Indeed, "a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis and course of treatment [does not] support a claim of cruel and unusual punishment." *Harris v. Thigpen,* 941 F.2d 1495, 1505 (11th Cir.1991).

Although Dr. Freudenberger initially told the plaintiff on July 11, 2012, that he would schedule the plaintiff for a L4–5 microdiscectomy, the plaintiff does not dispute that on November 7, 2012, Dr. Freu-

denberger made an addendum to his earlier assessment of the plaintiff's condition on July 11, 2012. Dr. Freudenberger stated that in reviewing multiple MRIs of the plaintiff, including cervical, thoracic, and lumbar spine, he did not "appreciate any signs of severe central stenosis," and there are some concerns raised by a neurologist that there was evidence of long tract signs, but Dr. Freudenberger did not see this ratified on any studies. (Doc. 33–1, Hood Aff. at 11; Doc. 33–1 at 26). Dr. Freudenberger further stated that he did observe at L4–5 a slight right paracentral disc bulge at the neural foraminal level, but it was not severe in nature. (*Id.*). Also, there could be a component of L4 versus L5 nerve root, but once again it was not of great concern. (*Id.*). Dr. Freudenberger noted that the plaintiff's prior cerebrovascular accident could contribute to the weakness on the right upper and lower extremity if he had a left sided CVA. (*Id.*). Dr. Freudenberger recommended proceeding with conservative management and concluded that it was appropriate to "sign[ ] off from this case." (*Id.*).

More recently, on January 9, 2014, the plaintiff underwent an MRI of the lumbar spine with and without contrast. (Doc. 33–1 at 24). Dr. Cannon concluded that the plaintiff's lumbar spine structures were well preserved and there was no new interval change detected as compared to the previous examination of March 2012. (Doc. 33–1 at 24). Dr. Cannon further noted that he had reviewed the plaintiff's December 2009 MRI and detected no new interval change. (*Id.*).

The plaintiff contends that Dr. Cannon is employed by a company that "defendant Hood throws an enormous amount of business to and one can rest assured that Joe Cannon is going to read an MRI the way defendant Hood wants it read, whether its [sic] accurate or not." (Doc. 47 at 15). However, the plaintiff submits no evidence

in support of his claims that Dr. Cannon has misrepresented the plaintiff's medical condition, and makes only conclusory allegations concerning the same. The court is not required to accept the plaintiff's wholly unsubstantiated attack on Dr. Cannon's findings.

The plaintiff further disputes Defendant Hood's determination that a brain MRI taken of the plaintiff revealed that he suffered a stroke in the past which has caused and contributed to his muscle spasm, hyper reflexia, and resulting back pain. (Doc. 33–1, Hood Aff. at 13). Defendant Hood contends that since the plaintiff's back pain is caused by a prior stroke, he is not a surgical candidate. (*Id.*). The plaintiff claims that Dr. Mulpur examined him on September 27, 2012, and informed him that he had not suffered a stroke but had a pinched nerve. (Doc. 32 at 16).

The fact that other doctors may disagree with Defendants Hood and Ambroski concerning the plaintiff's medical condition or recommended course of treatment does not establish that Defendants Hood and Ambroski have been deliberately indifferent to the plaintiff's serious medical needs since a difference in professional opinion between doctors does not rise to the level of constitutional scrutiny. *See White v. Napoleon*, 897 F.2d 103, 110 (3rd Cir.1990) (explaining that similar to an inmate's disagreement with a doctor's professional judgment, no claim is stated when a doctor disagrees with the professional judgment of another doctor since there may be several acceptable ways to treat a medical condition).

The medical records are void of evidence that Defendants Hood and Ambroski had subjective knowledge of, and disregarded, a risk of serious harm to the plaintiff due to his back pain. There is no evidence that the defendants ever refused to treat the plaintiff or were otherwise deliberately

indifferent to the plaintiff's medical condition. Neither is there evidence that the treatment Defendants Hood and Ambroski provided the plaintiff was "so grossly incompetent, inadequate, or excessive as to shock the conscience." *Adams v. Poag*, 61 F.3d 1537, 1544, 1545 (11th Cir.1995) (whether governmental actors "should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding liability under the Eighth Amendment") (quoting *Estelle*, 429 U.S. at 107, 97 S.Ct. 285).

Based on the foregoing, Defendants Hood and Ambroski's motion for summary judgment on the plaintiff's Eighth Amendment medical claims is due to be granted and the claims are due to be dismissed. To the extent the plaintiff may be attempting to assert medical malpractice claims against Defendants Hood and Ambroski as supplemental claims to his § 1983 action, such claims would be subject to dismissal pursuant to 28 U.S.C. § 1367(c)(3) once all other claims over which this court has jurisdiction have been dismissed, as recommended herein.

### 4. Defendants Estes & Patrick

The plaintiff claims that he notified Defendants Estes and Patrick several times that he was being denied adequate medical care but they failed to respond to his complaints. Because the plaintiff has failed to establish that prison medical staff was deliberately indifferent to his serious medical needs, the plaintiff's claims that Defendants Estes and Patrick violated his constitutional rights on the basis of supervisory liability necessarily fail also.

Even if the plaintiff had stated a cognizable medical claim, a prisoner cannot rely on doctrines of vicarious liability or *respondeat superior* in establishing liability pursuant to § 1983. *See Monell v. Dep't of Soc. Serv.*, 436 U.S. 658, 690–92, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Harris v. Ostrout*, 65 F.3d 912, 917 (11th Cir.1995). There is nothing before the court which establishes that Defendants Estes and Patrick personally participated in or had any direct involvement with the plaintiff's medical treatment.

At most, the plaintiff alleges that Defendant Patrick assured the plaintiff that he would talk to medical staff about the plaintiff's condition. However, there is no dispute that neither Estes nor Patrick have any medical training and medical personnel made all decisions concerning the plaintiff's course of treatment. "[S]upervisory officials are entitled to rely on medical judgments by medical professionals responsible for prisoner care." *Williams v. Limestone County, Ala.*, 198 Fed.Appx. 893, 897 (11th Cir.2006). Prison officials are not under a duty to directly supervise medical personnel or to intervene in treatment decisions where they have no actual knowledge that intervention is necessary to prevent a constitutional deprivation. *See Spruill v. Gillis*, 372 F.3d 218, 236 (3rd Cir.2004) (in the absence of a reason to believe, or actual knowledge, that medical staff is administering inadequate medical care, non-medical prison personnel are not chargeable with the Eighth Amendment scienter requirement of deliberate indifference); *Antonelli v. Sheahan*, 81 F.3d 1422, 1428 (7th Cir.1996) ("A prisoner may not attribute any of his constitutional claims to higher officials by the doctrine of *respondeat superior*; the official must actually have participated in the constitutional wrongdoing." (internal quotation marks and citation omitted)); *Vinnedge v. Gibbs*, 550 F.2d 926 (4th Cir.1977) (a medical treatment claim cannot be brought against managing officers of a prison absent allegations that they were personally connected with the alleged denial of treatment).

Therefore, Defendants Estes and Patrick's motion for summary judgment on the plaintiff's Eighth Amendment medical claims is due to be granted and the claims are due to be dismissed.

## C. Fourteenth Amendment Equal Protection

 The plaintiff further claims that the defendants have violated his Fourteenth Amendment right to equal protection by denying him back surgery. To allege a cognizable claim under the Equal Protection Clause of the Fourteenth Amendment, a plaintiff must allege that he is similarly situated with other persons who were treated differently and that the reason for the differential treatment was based on some constitutionally protected interest such as race, religion, or national origin. *See Jones v. Ray*, 279 F.3d 944, 946–47 (11th Cir.2001). Moreover, to establish an equal protection violation, a plaintiff must establish the existence of intentional or purposeful discrimination. *See Whitus v. Georgia*, 385 U.S. 545, 550, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967).

 The plaintiff, who is African–American, names white inmates who experienced back conditions that were either as severe as his, or less severe, but who were afforded back surgery. While the plaintiff alleges generally that these inmates experienced back pain, he has no personal knowledge of these individuals' medical and treatment history or their individual diagnoses to establish that they were similarly situated with him. Moreover, the plaintiff's conclusory allegations fail to establish the defendants' decisions regarding his medical care were motivated by his race. Therefore, the defendants' motions for summary judgment on the plaintiff's Fourteenth Amendment equal protection claims are due to be granted and the claims are due to be dismissed.

## RECOMMENDATION AND NOTICE OF RIGHT TO OBJECT

Accordingly, for the reasons stated above, the magistrate judge RECOMMENDS that the defendants' motions for summary judgment on the plaintiff's Eighth Amendment medical claims and his Fourteenth Amendment equal protection claims be GRANTED and the claims be DISMISSED WITH PREJUDICE.

Any party who objects to this report and recommendation must, within fourteen (14) days of the date on which it is entered, file specific written objections with the clerk of this court. Any objections to the failure of the magistrate judge to address any contention raised in the complaint also must be included. Failure to do so will bar any later challenge or review of the factual findings or legal conclusions of the magistrate judge. *See* 28 U.S.C. § 636(b)(1)(C); *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1986); *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir.1982) (*en banc*). In order to challenge the findings of the magistrate judge, a party must file with the clerk of the court written objections which shall specifically identify the portions of the proposed findings and recommendation to which objection is made and the specific basis for objection. A copy of the objections must be served upon all other parties to the action.

Upon receipt of objections meeting the specificity requirement set out above, a United States District Judge shall make a *de novo* determination of those portions of the report, proposed findings, or recommendation to which objection is made and may accept, reject, or modify in whole or in part, the findings or recommendations made by the magistrate judge. The district judge, however, need conduct a hearing only in his discretion or if required by law, and may consider the record developed before the magistrate judge, making

his own determination on the basis of that record. The district judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Objections not meeting the specificity requirement set out above will not be considered by a district judge.

A party may not appeal a magistrate judge's recommendation directly to the United States Court of Appeals for the Eleventh Circuit. Appeals may be made only from a final judgment entered by or at the direction of a district judge.

The Clerk is DIRECTED to serve a copy of this report and recommendation upon the parties.

**DONE,** this the 2nd day of February, 2015.